**Hosea SIMMONS and Andrea Williams, Plaintiffs-Appellants,**

**v.**

**William Ryan DREW and the Housing Authority of the City of Milwaukee, Defendants-Appellees.**

**No. 82–2773.**

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1983.

Decided Sept. 12, 1983.

James A. Gramling, Jr., Louis J. Mestre, Legal Action of Wisconsin, Inc., Milwaukee, Wis., for plaintiffs-appellants.

Michael A.I. Whitcomb, Asst. City Atty., Milwaukee, Wis., for defendants-appellees.

Before CUMMINGS, Chief Judge, NICHOLS * and PELL, Circuit Judges.

CUMMINGS, Chief Judge.

Plaintiffs are two participants in a public rent assistance program who claim that the Fourteenth Amendment entitles them to a hearing before the administering state agency may expel them from it. They commenced this civil rights suit under 42 U.S.C. § 1983 as a class action and seek money damages, declaratory and injunctive relief. Because summary judgment was granted against them before the class was certified, the only issues before us are those germane to the claims each asserts on her own behalf. *Roberts v. American Airlines, Inc.*, 526 F.2d 757 (7th Cir.1975), certiorari denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195.

Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, authorizes the Secretary of the United States Department of Housing and Urban Development ("HUD") to establish various programs to "aid[ ] lower-income families in obtaining a decent place to live and [to] promot[e] economically mixed housing." These programs are financed by the federal government, regulated by HUD, and administered by state public housing agencies ("PHA's"). One such program—the rent assistance program—helps low-income families to obtain rental housing in the open market. Briefly, the program works as follows: HUD contracts with a local PHA to make available each year a sum of money for the payment of rent on behalf of a specified number of families with incomes below a certain amount. The PHA then distributes this money by contracting to pay each person who agrees to rent housing to one of these families a fixed percentage of the family's rent.

Before a PHA will begin to make rental payments on behalf of a family eligible to receive them, four things must happen. First, the family must be admitted into the rent program. Families apply to their PHA for admission; those admitted receive a certificate authorizing them to participate in the program. When the program is full, eligible applicants are placed on a waiting list. Second, once a family is admitted, it must within a stated period of time find someone willing to rent to it and submit a proposed lease to the PHA for its approval. Third, the PHA must approve the proposed lease if it finds, after an inspection, that the dwelling to be leased is in decent, safe, and sanitary condition and that the terms of the proposed lease conform with the requirements set forth in regulations issued by HUD. Fourth, and last, the necessary papers must be signed: the lessor and family must sign the lease and the lessor and the PHA must sign a contract containing the terms and conditions of the PHA's promise to pay the lessor a fixed percentage of the family's rent.

---

* The Honorable Philip Nichols, Jr., Circuit Judge of the United States Court of Appeals for the Federal Circuit, is sitting by designation.

Plaintiff Andrea Williams had completed the first of these steps when the defendant Housing Authority of the City of Milwaukee ("Milwaukee PHA")[1] sent her written notice that it had expelled her from the program; plaintiff Hosea Simmons was sent a similar notice after having completed three of the four steps. The notices informed plaintiffs why they had been expelled—each was alleged to have violated a lease she had previously received through the program, Williams by permitting a person not named in the lease to reside with her and Simmons by moving into her new residence two weeks before her lease on her old residence expired. The notices also advised each plaintiff that she had a right to an informal hearing conducted by the Milwaukee PHA. Although the notices did not say so, the purpose of those hearings would not be, as it probably seemed to plaintiffs, to determine whether they had in fact committed the alleged lease violations but rather to determine whether the Milwaukee PHA should forgive the violations and readmit plaintiffs into the program. Simmons and Williams both requested and were granted hearings and both were readmitted into the program some two months after having been expelled.

Because plaintiffs were expelled from the program, it is quite likely—although not certain—that they did not begin to receive rent assistance until some two months later than they would have had they not been expelled. The Milwaukee PHA refused to compensate plaintiffs for that loss, not because it found that it had just cause to expel them or because it found that the payments had not in fact been withheld for two months, but because it claims it has no power to make any retroactive payments of rent assistance benefits. It is this fact that is the heart of plaintiffs' claim that the Milwaukee PHA was constitutionally required to afford them a hearing before it expelled them.

▮ Plaintiffs can complain about lack of process only if the Milwaukee PHA deprived them of property protected by the Fourteenth Amendment when it expelled them from the rent assistance program for two months. Issuing a family a certificate admitting it into the rent assistance program is much the same as conferring job tenure upon a public school teacher. Tenure restricts the power of a state to terminate the employment of one of its teachers; it gives the teacher the right to continue teaching so long as the state lacks just cause to fire him. See *Smith v. Board of Education*, 708 F.2d 258 (7th Cir.1983). A certificate limits the power of a PHA to deny rent assistance to the family that holds it; until the certificate expires, it gives the family the right to continue participating in the program so long as the PHA lacks just cause to expel it. Both the Milwaukee PHA's own internal operating rules and a regulatory handbook put out by HUD list the grounds sufficient to constitute just cause for expelling a family from the program. It is unclear whether the provisions in HUD's handbook are binding upon PHA's, see *Nichols v. Landrieu*, No. 79–3094 (D.D.C. Sept. 12, 1980), and that raises the question whether the right of participating in the program that vests when a certificate is issued is federally or state created. But whichever is the case, it is plain that just as job tenure is a species of property protected by the Fourteenth Amendment, *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570, so too is "program tenure," the right of certificate holders to participate in a rent assistance program by seeking out persons willing and able to rent them housing pursuant to the rules of the program. *Ferguson v. Metropolitan Development & Housing Agency*, 485 F.Supp. 517 (M.D.Tenn.1980); *Brezina v. Dowdall*, 472 F.Supp. 82 (N.D.Ill.1979); *Watkins v. Mobile Housing Board*, No. 79–0067–p (S.D.Ala. May 14, 1979). Cf. *Holbrook v. Pitt*, 643 F.2d 1261, 1278 and n. 35 (7th Cir.1981).

It might be argued, and there are traces of this argument in the district court's memorandum opinion awarding defendants summary judgment, that because plaintiffs

---

1. The other defendant is William Ryan Drew, the executive director of Milwaukee PHA.

were readmitted into the program two months after having been expelled, they were not deprived of this property. It is conceivable, though extremely unlikely, that the signing of Simmons' lease and rent assistance contract effective May 8, 1980, and the processing of Williams' alternative requests for approvals of proposed leases of two units [2] might have been held up for two months even had they not been expelled from the program. Thus, goes the argument, it is possible that neither plaintiff suffered any loss of rent assistance benefits.

■ The PHA's argument assumes that there can be no constitutional deprivation if there is no demonstrable loss of benefits. However logical that assumption may seem, the Supreme Court squarely rejected it in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252, when it held that persons deprived of property without due process could sue under Section 1983 for nominal damages. The rationale is that it is more important that procedural rights guaranteed by the Constitution be protected than that the public be spared the cost, and state agents the inconvenience, of litigating claims worth little or no money. Thus regardless of whether plaintiffs lost any benefits or whether the Milwaukee PHA had a legitimate ground for expelling them, expelling plaintiffs from the program for two months deprived them of property protected by the Fourteenth Amendment.

■ Shortly before Williams was expelled, a Wisconsin court evicted her from the rented dwelling she then occupied because it found that she had permitted more people to live there than the lease allowed. The court made its finding after a bench trial at which Williams appeared and had ample opportunity to present her version of the facts. Sharing living quarters with more people than a lease permits is a proper ground for expulsion from the rent assistance program, so that when the Milwaukee PHA learned of the eviction, it expelled Williams. Since there is no reason to suppose that the Milwaukee PHA is in a better position than a court to determine how many people are living together under one roof or that Williams was prevented from presenting fully to the court her version of the facts, the Milwaukee PHA was not constitutionally required to afford her a second hearing before or after it decided to expel her.

Simmons, however, was not given a hearing before she was expelled from the program. The Milwaukee PHA expelled her after determining on its own that two weeks before her lease was due to expire, she had moved out of the dwelling in which she had been living. The Milwaukee PHA had been paying rent assistance on the dwelling, and both its operating rules and HUD's regulatory handbook provide that a tenant who vacates a subsidized unit before the lease expires may be expelled from the program. The Milwaukee PHA had good reason for thinking that Simmons had moved out. It had recently approved her request to move to a new place and an inspection of the old place revealed that except for a few odds and ends—some clothing hanging in a closet, a disconnected telephone, possibly a sewing machine, a typewriter, and some food in the refrigerator—it was empty. As things turned out, the Milwaukee PHA was probably right. But things might have turned out otherwise. There was a chance when the Milwaukee PHA decided to expel Simmons that although her dwelling was almost empty, she was still living there. It might have turned out that she had been robbed or wrongfully evicted or that she had moved virtually all of her belongings to her new place but continued to reside in her old place for fear of being expelled from the program. In fact, there is evidence in the record to support the last of these.

Simmons was not given a chance to offer the Milwaukee PHA these or any other explanations until after she had already

---

**2.** Williams' March 31, 1980, request for a lease approval for a unit on 27th Street in Milwaukee was turned down because it needed repairs.

Her April 14, 1980, request for lease approval for a unit on Medford Avenue was approved on May 8, 1980.

been expelled. That might not be constitutionally objectionable—we reserve judgment on the matter—were it not for the fact that the Milwaukee PHA claims it has no authority to pay any rent that accrues during the time someone is wrongfully excluded from the program. The public has an interest in seeing that its tax dollars are not spent paying rent on unoccupied dwelling units, and expelling from the rent assistance program those persons who vacate their units early is an effective means of protecting that interest. Simmons, of course, has an interest in living someplace reasonably safe and sanitary, and requiring that she be afforded a hearing before being expelled from the program protects that interest. But affording her a hearing after she is expelled also protects that interest, assuming that any benefits she loses while she is expelled can be returned to her, and maybe, given the likelihood that an empty apartment is unoccupied and given that the loss suffered by someone expelled from the program is offset somewhat by the benefit gained by his replacement, a hearing after expulsion is all that is constitutionally required. See *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982).

■ Be that as it may, assuming without deciding that the Milwaukee PHA is correct in claiming that it lacks the power to award retroactive rent assistance payments, it was constitutionally required to grant Simmons a hearing before it expelled her. The hearing need not have been modeled after a court trial. Notice of the reason the Milwaukee PHA wanted to expel her followed by an informal hearing like the one she received after being expelled is all that the Constitution required. The notice need not even have spelled out the facts that led the Milwaukee PHA to charge Simmons with vacating her dwelling unit; in this case, the charge itself was specific enough to have conveyed sufficient information for Simmons to have defended against it.

Summary judgment against Williams is affirmed; that against Simmons is reversed; and the case is remanded for further proceedings consistent with this opin-

ion. We express no view on whether the class Simmons seeks to represent should be certified and we leave it to the district court to calculate the amount of damages Simmons may have suffered during the two months she was excluded from the program, as well as any declaratory or injunctive relief that may be appropriate.

PELL, Circuit Judge, concurring in part and dissenting in part.

During the course of what I regard as a thoroughly well-reasoned Decision and Order of District Judge Evans he observed that while he might without considerable difficulty determine that in theory that a pretermination hearing was appropriate, when he looked to the government's interest, applying the requirement for pre-termination hearings to be the complicated bureaucratic Rent Assistance Program, and viewed the existing procedures, he wondered why this case was filed. I express the same wonder as to why on the facts of the Simmons case it is being reversed for further proceedings. While I concur in the result reached as to Williams, I respectfully dissent from the Simmons portion of the majority decision and would adopt the Decision and Order of the district court as the opinion of this Court.

Because the district court's Decision and Opinion was not published, I set forth as a part of my dissent, extracts from that Decision and Order:

Plaintiffs have rights to due process of law in the termination of their Section 8 benefits if certain requirements are met. First, there must be governmental action sufficient to invoke the guarantees of the Fifth Amendment. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345 [95 S.Ct. 449, 42 L.Ed.2d 477] (1974). The Housing Authority of the City of Milwaukee is a government entity and defendant Drew is acting under his authority as its Executive Director and Secretary. As far as is relevant to this case, both the Housing Authority and its Director are acting through a relationship with the U.S. Department of

Housing and Urban Development. Governmental action is clear.

Secondly, in order to establish a right to due process, plaintiffs must establish that they have a liberty interest or a property interest to which there is a claim of entitlement. *Morrissey v. Brewer,* 408 U.S. 471 [92 S.Ct. 2593, 33 L.Ed.2d 484] (1972). In order to have a protected property interest, plaintiffs must show that they have more than a "unilateral expectation" of the benefit. *Board of Regents v. Roth,* 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972). It seems fairly well established that a participant in a Section 8 Program has a legitimate claim of entitlement to benefits. *Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir. 1981); *Singleton v. Drew,* 485 F.Supp. 1020 (E.D.Wis.1980).

Thus the question becomes, what process is due. The question involves both the timing of the due process hearing (prior to or after benefits are terminated), and the range of due process tools which must be involved (e.g., cross-examination, subpoenaing of witnesses, etc.).

Determining whether a hearing must precede or follow government action is for courts often an excursion into a theoretical realm and the answer involves an abstract determination of whether an interest protected is more like the right to welfare benefits, as in *Goldberg v. Kelly,* 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970), or like Social Security benefits, as in *Mathews v. Eldridge,* 424 U.S. 319 [96 S.Ct. 893, 47 L.Ed.2d 18] (1976). *Mathews* sets forth the factors to be considered:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." At 335 [96 S.Ct. at 903].

Using these factors, several courts have determined that terminations from various housing programs require pre-termination hearings. See: *Ferguson v. Metro. Development and Housing Agency,* 485 F.Supp. 517 (M.D.Tenn.1980); *Escalera v. New York City Housing Authority,* 425 F.2d 853 (2d Cir.1970); *cert. den.,* 400 U.S. 853 [91 S.Ct. 54, 27 L.Ed.2d 91]; *Caulder v. Durham Housing Authority,* 433 F.2d 998 (4th Cir. 1970); *cert. den.,* 401 U.S. 1003 [91 S.Ct. 1228, 28 L.Ed.2d 539] (1971). Recently, in a Section 8 case involving the retroactivity of payments, the Court of Appeals for this circuit has stated: "... Appellants must receive some sort of hearing before retroactive benefits are finally denied ..., since the 'fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Holbrook, supra,* at 1281.

Under the *Mathews* criteria, the private interest in this case as well as the risk of an erroneous deprivation might lead me to conclude, without considerable difficulty, that in theory a pre-termination hearing is appropriate. However, when I look to the government interest, apply the requirement for pre-termination hearings to the complicated bureaucratic Rent Assistance Program and view the existing procedures, I wonder why this case was filed. In some situations, using "termination" to mean what the parties to this lawsuit assume it means, it is impossible to hold pretermination hearings. It would be unfair to the program to glibly declare that pre-termination hearings are always required because, as defendants correctly point out, in some situations there is simply no landlord under contract with the program to whom payments can be made.

A variety of occurrences can result in termination from the program. Some, such as failure to keep appointments with program officials or damage to a unit which does not result in eviction have no effect on the lease between a landlord and the tenant and therefore have no effect on the place of residence of the tenant. Other offenses, most notably, moving out prior to the expiration of the lease, mean of course a change

in residence. Given the definition of "termination" used by both sides to this lawsuit, whether or not a change in residence is involved is significant to whether a hearing *can* be pre- or post-"termination."

Because of the structure of the program, payments cannot be made unless there is an existing contract with the landlord whose rental unit has been approved. Therefore, when a situation arises which involves, for whatever reason, a tenant vacating an approved unit prior to moving into another approved unit, benefits must necessarily be interrupted. If the abandonment of a unit occurs without notice or with inadequate notice to the program, benefits will be interrupted without a prior hearing. Nothing anyone can demand of the program can change that fact.

However, it seems to me that in reality the way the program is now run an interruption of benefits is not a "termination" of eligibility in the program. An abandonment of a unit necessarily gives rise to an interruption of benefits and the *possibility* of termination from the program entirely, that is, a loss of eligibility. However, before a person loses eligibility for the program, a hearing is held. For me to order the program to use different words in describing its procedures would be nothing more than ordering a change for cosmetic purposes.

\* \* \* \* \* \*

Plaintiff Hosea Simmons lost benefits more because of bureaucratic hardheadedness than lack of procedural protections. And to the credit of the program, following a hearing she was reinstated in the program. Simmons had a lease and a contract for March 1, 1979 through February 29, 1980. On December 14, 1979, she was certified for another year of eligibility. On February 11, 1979, Simmons requested lease approval for a new rental unit. Approval was granted February 14, 1980. On February 20, the program was informed that Simmons had vacated and damaged her first unit. After inspecting the unit, on March 4, 1980, the program sent Simmons a notice that she was being terminated because she

vacated her unit prior to the expiration of her lease. A hearing was held on April 1, 1980, and on April 9, 1980, she was notified that her participation in the program could continue, but on April 17 she was notified that she had to satisfy the damage claim from the first unit before benefits would begin. She did so on May 5, and effective May 8, 1980, a lease and contract were entered into for her second unit.

Simmons' hearing revealed a remarkable attitude on the part of the program officials. Her attorney attempted to determine why moving out 13 days in advance of the end of the lease period was per se a violation. (No claim of non-payment of rent was made.) The answer was, "Well, basically the program feels that the tenant would be required to live up in there til the last day of the lease period." (Affidavit of Ann Marie Steffen Oldenburg, Ex. 10, p. 3.) Later in the hearing Simmons' lawyer asked:

"So you're telling me that the program policy is that the tenant, a tenant in Rent Assistance, is expected to move out on the last day of the one year lease period.

A. Correct ... that's generally what most of them will do."

As an explanation of why she moved early, Simmons asserted that she had found a unit which might not be available if she waited until March 1 to rent it. Further, she stated, without contradiction, that her moving costs in the middle of the month were less than they would be at the end. Apparently the absurdity of the program's position became clear to the decisionmaker and Simmons was "continued" in the program.

Simmons was improperly "terminated." However, through the procedural machinery already in place, she was reinstated. Nothing I can order can prevent some bad calls. And I am convinced that to order meaningless changes would put an unjustified burden on the program that would not result in a benefit to the recipients. In fact, the more hurdles the program has to

jump to be administered, the less money is left to distribute in benefits.

\* \* \* \* \* \*

Plaintiffs also argue that the notice and hearing provided are deficient. The issue is what process is due. The answer, I believe, is not very much. The plaintiffs are trying to take too large a bite out of the apple by arguing that certain procedures, many of which are akin to a criminal prosecution, are required here. Instead, the following procedures seem appropriate. A notice must be sent setting forth the violation which has allegedly occurred. It must state that a hearing may be requested. The procedure to be followed in obtaining the hearing must be explained and the notice should state that counsel is allowed, though not required, at the hearing.

The hearing itself must meet certain requirements. The recipient must be allowed to present evidence and offer information. Although the decisionmaker must be fair, prior contact or involvement in the initial decision to terminate is not a ground for disqualification. The decision rendered must be based on the material presented at the hearing (although no rules of evidence apply) and must be issued soon after the hearing. It need not be a formal decision with findings of fact or conclusions of law; however, it should inform the recipient of the reasons for the decision. What the agency presently does is close enough to what I am suggesting here, therefore no order on the point will be issued.

I am particularly troubled by the fact that Simmons apparently candidly admitted at her hearing that she had moved before the expiration of the term of the lease; that she had found a unit which might not be available if she waited until March 1 to rent it; and that moving costs in the middle of the month were less than they would be at the end. If she had had a pre-termination hearing I think it would be safe to assume that she would have admitted that she moved and thereby she would have conceded being in violation of one of the specific provisions of the Program Manual. The result on remand appears to be foreor-

dained and to be requiring a fruitless exercise in an already overburdened court system. Due process is extremely important in American jurisprudence and I would not express an opinion which would in any way diminish our adherence to it. I simply think that in the Simmons situation, due process being in essence fairness of procedure, Simmons was not denied all of the process due her.